This is a simple breach of contract claimed by Park Avenue Podiatric Care, a non-ERISA entity, relating purely to state law causes of action. The District Court determined and prompted that those claims were preempted by ERISA Section 514. This court should vacate the judgment of dismissal, reverse the District Court's order, reinstate the complaint, and remand this case for further proceedings. The judgment could be vacated because the District Court's order dismissing the complaint was the result of a string of reversible errors. Those errors resulted in the District Court erroneously determining that Park Avenue's state law claims were expressly preempted by ERISA. The first error committed by the District Court was finding that ERISA regulated the relevant patient's plan. That was a reversible error because there was no element in the dismissal form that established the relevant patient's plan was subject to ERISA regulation. So your contention is that the plan is not incorporated by reference or necessary to the allegations of the complaint?  The District Court determined implicitly or explicitly in this order that the health plan was integral to the complaint. The District Court found that the relevant patient's—that the complaint made several references to the patient's health plan throughout. I would ask the Court to look at those references and notice that when the Court quoted, when the District Court quoted from the complaint, the District Court quoted the complaint alleges that Sigmund determines the allowed amount for out-of-network services. And then they added in pursuant to the plan. The District Court said Sigmund communicated— But that paragraph, to be fair, the paragraph that's from is paragraph 20. Yes. Which starts with, not all plans provide out-of-network benefits. But when they do, so necessarily that means when the plan does provide for out-of-network benefits, Cigna determines the amount that will be paid. So it's when the plan provides for out-of-network benefits, Cigna makes a determination about what those out-of-network benefits will be. How can that not mean pursuant to the plan? But what I think is more important is because Sigmund determines that amount of payment. If the plan—because some plans—your complaint says some plans cover out-of-network, some don't. So in order to know whether this patient's plan even covers out-of-network services like the ones provided by your client, we'd have to look at the plan. That coverage determination was already determined. Once the plan— But the question right now that we're stuck at is, is the plan integral to the complaint such that the district court could consider it and thereby determine that this was an ERISA preempted action? And I'm just having a really hard time figuring out how paragraph 20 in particular doesn't say, we've got to look at the plan to figure out whether out-of-network is covered. And then Cigna determines, if it is covered, how to do that. The rest of the complaint makes clear that Cigna determined that the services were covered. What the district court didn't address was the payment that Cigna made. That payment by Cigna completed its obligations under ERISA. The payment by Cigna was merely a consequence of its determination that coverage was available. Once Cigna— How did it know coverage was available for this patient? That's circular, isn't it? Cigna knows coverage is available because it covered it? Cigna issued payment only because coverage was available. And how did Cigna determine that coverage was available? They don't tell us. Well, the complaint does. Well, the complaint says that Cigna issued payment. The complaint doesn't say that Cigna— Well, Cigna adjudicated the claim in its own process. The claim goes into whatever black box that Cigna has. Whatever determinations are made by Cigna is completely irrelevant to Park Avenue Podiatric. Okay, so the way that Cigna makes the determination is an unnamed employee makes a decision in response to a phone call. And that is the way that Cigna determines payment for out-of-network providers. And that employee is not looking at the plan. There's no reference to the plan involved here is your claim. Our claim is that when Cigna issues payment, the amount of payment that Cigna issues is determined solely by Cigna, not by the terms of the plan. All the terms of the plan do is establish whether or not Cigna should issue the payment. But once Cigna issues the payment, Cigna's obligation is under the plan. Cigna has determined that Park Avenue has a right to payment. All right, so the calculation may not be under the plan, but the determination of whether payment is owing is determined by the scope of the plan. Yes. Okay. Cigna determined that Park Avenue had a right to payment. They determined that under the terms and conditions of the plan, they should issue a check to a non-party to that plan. Now, this circuit court, this very circuit has determined, as have other circuits that have addressed the question, that once an insurer makes a claim, makes a determination about your right to payment, the issue becomes the amount of the payment. The amount of payment claims are not subject to a risk of preemption. We know this from the circuit court's decision. We also know this, we ask the court to adopt the hospice metro of Denver, which we submit, will guide this court in coming to a proper determination for determining that cases where an underpayment was made, that is where the insurer has already determined that the provider has a right to payment, and the sole issue is the calculation of that payment? I have to say, Mr. Kearns, I find the way that you describe what's at issue here a little artificial, to say that what's at issue is purely a calculation error. In the complaint, or actually maybe it's in the brief, it frequently refers to Cigna intentionally incorrectly calculating the payment, which to me has an odd feel to it to say that it's intentionally incorrectly calculating it, as a way of framing this as a pure calculation error, whereas it feels more akin to a refusal to pay. It's not that there's a formula that they were supposed to use and they accidentally got it wrong, because you're saying they intentionally did this, and so this is not a pure refusal to pay situation, but it seems closer to that than sort of a pure calculation error as you're framing it. I think the easiest thing would have been for somebody from Cigna to say at the district court level, this is what we were supposed to pay under the plan, this is what we paid, and therefore we owe no further obligations, but we don't know that. But I think more importantly is what is the benefit of the plan? As this court said in Montefiore, the benefit of a health plan is the access to a benefit at no cost or a reduced cost. But you're also arguing under Montefiore that the phone call that was made where the patient, where the alleged promise to cover 80% of the procedure was made creates a new contract. And in Montefiore, didn't the court hold that such phone calls do not create a new contract or a new plan? Many courts hold that such verification claim calls do not establish a new contract. The difference factor here and between all the cases that were cited by the appellee, my colleague, is that payment was made in that case. And how is that argument consistent with your argument before us that there's no issue about a plan here? The only remaining issue was the amount of coverage. So how can you on the one hand argue that the amount of coverage or how much would be covered is not preempted because it doesn't involve a plan, but a phone call promising coverage of 80% is itself a plan? Do you see the disconnect there? I'm struggling with that. How can you help me? How could I help you understand that is, first is we don't know if that's the plan term. We don't know if the representation that was made by the person on the phone from Cigna is actually... Is that because such representations go back to the plan? No, it was because that was a representation that was made by Cigna. If that representation made by Cigna's employee was consistent with the plan, I might have a difficult argument. I would still come back to my argument and say notwithstanding ERISA regulation, notwithstanding a plan being regulated by ERISA, an out-of-bound provider who has received an underpayment was commenced a state law cause of action to seek the additional payment, those types of claims have consistently been held by this circuit to not be subject to ERISA preemption. Now, granted, we do rely on cases that talk about subject matter preemption. But we believe that those cases are instructive, and we believe that they're instructive to the court because the primary concern or the primary analysis in that case is that it's a state law claim, that plaintiff is asserting a claim that is colorable as ERISA, and courts have consistently held where the sole issue is the amount of money that is owed or that is remaining owed. It's not a case that is colorable for ERISA, and if it's not colorable as ERISA, it certainly cannot relate to ERISA. I have another question for you. In the cases, some of the cases I assume you're referring to, or perhaps not, in the McCulloch case in particular, part of what the court is looking at, to my read of it, it's considering this question of whether there's an anti-assignment provision in a particular plan based on this idea that a provider's claim could be of the type that is covered by ERISA if, in fact, the provider has rights under the ERISA because the patient has assigned those rights. In McCulloch, they talk a lot about the fact that that particular plan had an anti-assignment provision, and so the provider really could not have recovered under ERISA, and that's why there was not preemption. Here, it's not clear to me from the materials whether or not there's an anti-assignment provision in this policy. I understand your view is that the plan is not sort of in front of us or relevant, but do those issues of assignment impact the analysis? The issue to the assignment in McCulloch goes to whether or not— I said there was a two-part test that came down from the bill of court that this court determined there was other subparts to it. And the issue about the assignment was whether or not the party raising the claim was the type of party that could bring an ERISA claim. There was another second step to that analysis that says, is that claim— once you determine whether or not the party could be a party that would assert that the bill of claim— Section 2 was, was the claim tolerable as ERISA? Now, we know that Park Avenue was not—so to get to your question, we don't know whether or not the plan has an anti-assignment provision because the entire plan wasn't put before the court. We also know that Park Avenue Podiatric Care is an out-of-network provider who is not a party to the ERISA plan. From that, we know that the ERISA statute does not provide Park Avenue podiatrists with a way, with a remedy. If Park Avenue is preempted, Park Avenue, like every other out-of-network provider, has no remedy. The ERISA statute and ERISA preemption is fundamentally—it's like a Pac-Man that goes around and goggles up causes of action for out-of-network providers. These out-of-network providers have no remedy. And to say that their claim that does not concern the rights of payment, does not concern— we're not claiming that there had anything to do with the administration of the plan. We're not challenging the decision to issue us payment. What we're saying is, you just did bad math. We believe you intentionally did bad math. We believe, or our clients believe, that Signe intentionally did bad math. Do you mean like the accident, they intentionally did 8% instead of 80%? Like my colleague, I'm confused about intentionally doing bad math. To do it as a way to save money. So what happens is— But this isn't like a digit flip or a decimal point being moved. It's a huge difference, which is why you're pursuing this case so vigorously, right? It's a six-figure difference. Yes. And I guess I'm just circling back to what Judge Lee asked, which is, what does that mean? That they—are you claiming that they pretended to misunderstand what 80% was? No, I think what they did was they have no system in place to make sure that what they say on the phone matches what they actually do. What I'm saying is they told us one price, and at the end of the day, paid us another. And then told us, too bad, so sad. A risk applies. And what we're saying is, part of it is what I think everybody— that see that insurance companies underpay claims. We say intentionally underpay the claim. We say they do that as a way to generate profits. We do that to say that any amount that they underpay, the difference between what they said they would pay and they underpay, goes into their pockets. You know, since the days those certain underwriters met in a cafe in London, people who underwrite claims, insurance companies, have been trying to make profits by underpaying claims. The case before us was a case before we argued, this case, was a case where an insurance company was trying to not pay. If you're not a party to the contract, though, if you're out there and you have an independent agreement between the insurance category, they say, hey, we're going to pay you money if you do something. And then the person does that. And then they ratify the agreement by accepting the service, accepting the work, and then just not agreeing to pay what they want to pay. And, you know, that's just not – that shouldn't be how it works. And there shouldn't be – and the court should recognize, you know, the market realities of these providers will not have any remedy. They will be left out in the cold. Is the remedy elsewhere, though? You know, our courts are constrained by the laws that we must follow and by the precedent. Is the remedy elsewhere? In other words, with a different body? She's asking if the policy remedy that you're looking for – I mean, that's essentially – it sounds like what you're raising are policy concerns about the nature of the insurance business. But there is a framework that we are constrained by in terms of preemption and ERISA and what other branches have decided how these are to be addressed. And as Judge Kahn said, we have laws that specifically guide us on how we're supposed to look at this. You do. And we cited that law. It's the Patacacio case. And the Patacacio case says that state law claims that don't seek to deny a wrongful denial of benefits. There was no denial of benefits. Again, the patient received the service. Again, I want to talk – Costco. I hate to personalize this. I'm a member of Costco. Basically, you join Costco. You pay a fee to Costco. They give you a card. And you get – and a number. And you get access to services and products that non-members don't – at a price non-members don't get. Cigna does the same thing. Cigna offers. You pay Cigna money. Cigna gives you a membership card and a number. And it tells you if you go to people that recognize our membership number, you'll get a service at a price non-members don't get. The Montefiore case recognized that and said that insurance – the benefit to insurance is that. It's the receipt of a service at either free or a less charge. So the patient received the service. The patient received the benefit of plan. Patacacio says if there's no denial, if you're not seeking to remedy a denial, and you have a state law cause of action, your cause is not preempted by a risk. That's this court's statement. That's this court's own holding. We say McCulloch is in keeping with that holding, although not mentioned. There was no denial there. McCulloch, too, was looking for additional money. But what I'd like to do is ask the court to look at the Hospice of Metropolitan Denver and see that in that particular case, the Tenth Circuit determined in that case there was a denial of payment. That means the insurance company told the hospice, we're not paying for the care that you rendered. And the court – about the Fifth Circuit holding – and the court said, listen, that denial was merely a – that denial payment was a consequence of the denial. They're not seeking to challenge that denial. What they're seeking to challenge is the failure to abide by its promise. And that's what we're seeking to do, enforce that promise that the insurance carrier said we will pay you 80 percent of the customary rate and then chose not to. As we explained, we put legislative material before the district court that explained how this system works, that explained to the legislators. It was from CRS that went to the Congress that explained to the legislators this is how private insurance works when you have an income. I think we have your claim unless my colleagues have questions. You've got some rebuttal time, so we'll hear from you again, Mr. Kearns. Okay. Mr. Walforth? Walforth? Thank you, Your Honor. My name is Edwin Walforth. I represent the SIGNA group from the office of Walforth. May it please the court, I'd like to first clear away some of the things that you just heard. First of all, as the plan document makes clear, this is a self-funded plan, so this is not a case of collecting premiums and denying benefits for preliminary reasons. On the contrary, SIGNA is simply acting as a claims administrator here, fielding claims on behalf of an employee-funded, an employer-funded health care plan. I would like to also address, briefly, before getting into the main topic of my argument, this rape versus right distinction that my friend was bringing forth. The rape versus right distinction arises in cases where coverage is determined by the plan, but there is a separate agreement between the provider and the plan administrator in this case. And it most frequently arises in the context of in-network provider agreements, but it can arise in the context of not-out-of-network providers where there's an explicit agreement as to what the amount of coverage would be. Those are the cases where the rape versus right distinction applies. There is no magic in the rape versus right distinction besides the fact that it's easily said that it distinguishes the right of coverage for the right to actually the amount of payment. And I would argue that the right to $1 and then the right to $2 and then the right to $3 in an amount case where the amount of the benefit is determined really has no logical distinction in terms of right to plan benefits. Mr. Kearns – well, let me put it this way. As Your Honors pointed out, Judge Hellerstein found that the complaint here was replete with references to the plan. And really, Plato is hanging his hat on one discreet paragraph of it, and that's paragraph 29 where it's alleged, During phone conversations between PHDC's employees and Cigna's employees, Cigna's employee represented that payment for coverage services rendered to SS was based on 80% of the customary rate. And from that is manufactured this idea that there is a collateral agreement that takes – that does away with decades of recent preemption jurisprudence and the express preemption clause of the statute itself. This case is actually quite reminiscent – well, we cited a slew of cases in which this precise issue had been determined and courts found that on the facts as alleged, an agreement was not in fact established. This is very similar to a case that my friend litigated before Judge Rakoff. The opinion was handed down the day that we filed our brief. Judge Rakoff considered language in a case against Aetna in which the allegation was, for the reimbursement rate, it's going to be 80% reasonable and customary. I would submit very close, if not on all fours, of the statement alleged here. And Judge Rakoff found no reasonable – I'm quoting – no reasonable person would understand that representation to be an offer or promise to pay a particular amount. That case is at 2023 Westlaw 85334865. And what's your take on the relevance of McCulloch? How does that speak to this case? Factually, it seems fairly similar, although it was in a different posture because I guess that issue was complete preemption as opposed to express. But how should we factor in that case? McCulloch is interesting in that it expressly distinguishes Montefiore on a ground that's applicable here. In my – in our case, the plan is actually – requires that there be a preauthorization call. The McCulloch case distinguished Montefiore, saying in the case before them that was not the case. Whereas in Montefiore, this court found that the plan administrator, acting pursuant to the plan in execution of an express duty to conduct preauthorization calls, made his statements in the course of those preauthorization calls part of and parcel to its administration of the plan and thus supported Montefiore's view that the claim there was preempted, different from McCulloch. To step back, as Your Honor pointed out, both those cases are – come up under 502, the complete preemption doctrine, from one of which was directly observed as whether the party is an appropriate party to make the claim and whether it's a tolerable claim. I think that Mr. Kearns had it backwards that it is not the case that if it's a case – let me put it this way. 514 is widely understood to be much broader than 502, the complete – I'm sorry, the express preemption is considered to be broader than the complete preemption of 502. In 502, we looked at whether there's a tolerable claim. Here we merely looked at whether there's a relation to or a reference to an erisic plan. Thus, the narrower holdings of Montefiore and McCulloch are instructive here because we are looking in both cases to whether there has been some kind of collateral and an independent undertaking by the plan administrator. But whether or not it relates to the plan is, again, a broader analysis. Here there was some discussion as to whether this was simply bad math or not. And in the papers, Pallant has said that it's something that can simply be looked up. That's actually not the case. What we're dealing with is a usual and customary rate, known in the jargon of the industry as a UCR rate. That's not something that's simply published in one spot. Phrases like usual and customary, I think your honors will appreciate, suggest a number of subjective and objective considerations. If it's analyzed, as an erisic fiduciary must do, as to whether a proposed rate by a provider is in fact usual and customary, that plan administrator will have discretion to decide which database, which frame of usual and customary, and the federal courts will accord it deference under the use of discretion standard as to whether that will apply. That's why this is important, and that's why the reference to usual and customary is not a phone book, as Mr. Cranston had me believe. It's actually something that comes at the core of plan administration. Of course, I've talked about paragraph 29, and really I think in this case, while it arises in the backdrop of erisic preemption, it goes down informally. Because here, there is no plausible allegation of a collateral benefit. This is not a case that we see sometimes in this instance where out-of-network providers are pushing to get out from an erisic in which they claim to have fallen. The call center employee says, forget about the plan, let's make a deal. That's not what happened here. That's not what's alleged to have happened. Here they've framed it very narrowly. I submit that a plaintiff here and their counsel, who are frequent filers in this area, are pushing on this concept of a collateral thing to a point where erisic preemption is going to narrow to become, frankly, invisible. Here the plan fiduciary simply recited what the plan term was. If that's enough to get you out from under erisic preemption, it's hard to know what a plan fiduciary is supposed to do. As a hypo, what if the sickness said, here's the plan, read it for yourself? Would there be any functional difference between that and the fact that they stated verbally what the benefit would be? I assume that there's not. If your honors have any questions, I see my time is limited here. All right. I think we have your argument. Thank you, Mr. Woolworth. I think now we'll have some rebuttal from Mr. Kearns. Thank you. My friend, Mr. Woolworth, said that the person on the phone merely recited what the plan term was. We don't know that. Well, the allegation is the employee, quote, represented that payment for covered services rendered to the patient was based upon 80% of the customary rate. The employee didn't say, I hereby offer that we will pay this entity for this surgery 80%. That sounds like the Cigna employee is reporting what the plan provides for. That's not what that 29 suggests to you? It's not what it expresses, no, your honor. It's not. And I think if what the insurance company wanted to do was to be bound by the plan, they would say, see what the plan terms are. You're paid according to what the plan terms are. But they chose not to do that. They chose to give a specific price. But what I really want to get to is the refers to language because that's the language, that's the statutory language that this court needs to interpret right now. Do these state law claims refer to an ERISA plan? And they do not. Why? We're not claiming any rights under an ERISA plan. We do not claim any breach of a plan contract, of a plan term. Our plan – our claims do not seek to enforce or modify the terms of any plan. And any ruling about how much they were supposed to pay really concerns how much it's going to cost Cigna to provide the benefits it chose to provide. And the Rutledge court – the Supreme Court in Rutledge said the cost of providing a benefit is not something that ERISA is concerned with. In that particular case, it was prescription medicine. In the state law, they said an insurance company has to pay a minimum price for prescription medicine. They basically stuck their fingers into the ERISA plan and said whatever you're going to pay at a minimum, it has to be this price. And the Supreme Court – and the insurance company said that's – it relates to ERISA. And the Supreme Court says no, no, no. It does not. It does not relate to ERISA because it does not require the insurer to provide a particular benefit to a particular person in a particular way. Which is what the Shaw decision and all the cases that determine that state law claims were precluded discusses. Does the effect of the state ruling require a plan to change its administration? And that's not the case here. Just like the Rutledge court acknowledged, the cost of doing business is the cost of doing business. And this is merely a cost of doing business. You have to pay the provider somehow, and it's their job to pay them. And we just ask the court to consider the commercial realities of a preemption decision in this case and reverse it on that one. Thank you for your time and your courtesy. All right. Thank you very much.